[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
September 16, 2008
THOMAS K. KAHN
CLERK

_____

No. 07-14201

_____

D. C. Docket No. 05-00016-CV-WLS-1

GARY CROSS,

                                                          Plaintiff-Appellee,

versus

METROPOLITAN LIFE INSURANCE COMPANY,

                                                          Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Georgia

_____

**(September 16, 2008)**

Before WILSON and PRYOR, Circuit Judges, and MIDDLEBROOKS,[*] District
Judge.

PER CURIAM:

_____

[*] Honorable Donald M. Middlebrooks, United States District Judge for the Southern
District of Florida, sitting by designation.

Gary Cross filed this action pursuant to 29 U.S.C. § 1132(a)(1)(B) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*, to recover long-term disability benefits under Georgia Pacific's employee welfare plan (the "Plan"). Metropolitan Life Insurance ("MetLife"), the Plan's administrator, terminated Cross's disability benefits in March of 2004. Cross sued MetLife to recover and reinstate these benefits, and requested attorneys' fees and costs related to his action.

Both parties moved for summary judgment. The district court applied the six-part analysis set forth in *Williams v. BellSouth Telecomms., Inc.*, 373 F.3d 1132, 1137 (11th Cir. 2004) to determine the appropriate standard for reviewing MetLife's decision to terminate Cross's benefits. Ultimately arriving at the arbitrary and capricious standard of review, the district court concluded that MetLife's determination was not supported by reasonable grounds. Accordingly, the court granted summary judgment for Cross. Upon careful review of the record and the parties' briefs, and after hearing oral argument, we affirm the district court's grant of summary judgment for Cross. MetLife's decision to terminate Cross's benefits was not supported by reasonable grounds.

## I. BACKGROUND

In 1984, Gary Cross began working for Georgia Pacific, a manufacturer and

marketer of tissue, packaging, paper, pulp, building products, and related

chemicals. While employed, Cross suffered from chronic back pain. In 1998, he

underwent a microdiscectomy,[1] recovered, and returned to work. The pain,

however, continued, and in July of 2001, Cross stopped working. In November of

2001, Cross underwent a second surgery, an anterior discectomy and anterior

lumbar interbody fusion with titanium bone cages.[2] A month later, Cross reported

that his back pain had returned, and applied for long-term disability benefits under

Georgia Pacific's disability plan. His benefits were approved by MetLife, the

Plan's administrator.

To be eligible for benefits under the Plan, an employee must meet the Plan's

definition of "disabled." During the initial twenty-four months of benefits, the

Plan defines "disabled," in relevant part, as: due to injury or sickness, being unable

to earn more than eighty percent of one's pre-disability earnings at "[one's] *own*

*occupation* for any employer in your local economy." After twenty-four months of

benefits, the Plan's definition of "disabled" changes, in relevant part, to: being

unable to earn more than eighty percent of one's pre-disability benefits at "any

gainful occupation for which [one is] reasonably qualified taking into account

---

[1] A microdiscectomy involves the surgical removal of a small amount of herniated disc material that presses on a nerve root or the spinal cord.

[2] This procedure involves the replacement of a portion of herniated disc material with a titanium implant.

3

[one's] training, education, experience, and predisability earnings." At the time of his disability, Cross worked as Shift Supervisor (also referred to as a Lead Operator Technician). According to MetLife's review of the Dictionary of Occupational Titles ("DOT"), Cross's position required "light strength demand." The Administrative Law Judge ("ALJ") who awarded Cross social security benefits, however, found that under the DOT, Cross's position required "medium exertion."

Cross began receiving disability benefits under the Plan in December of 2001. In August of 2003, MetLife initiated a review of Cross's entitlement to continued benefits, and over the next several months, it gathered evidence on Cross's medical status. Then, in March of 2004, MetLife terminated Cross's benefits, finding that Cross was "capable of light work capacity," that his prior job required light physical demand, and, thus, concluding that Cross was no longer considered disabled under the Plan.

MetLife based its decision to terminate Cross's benefits primarily on the following evidence.

One, MetLife's Special Investigation Unit recorded surveillance footage of Cross at a baseball diamond coaching his son's team. The footage shows, among other things, Cross bending at the waist, squatting, and arranging and carrying

4

equipment. MetLife argues that this footage reveals Cross performing activities inconsistent with his stated limitations.

Two, Cross's treating neurosurgeon, Dr. Javed, stated that Cross's MRI did not reveal any disc herniation and that "the levels above the disc essentially look normal." He concluded that Cross had reached maximal medical improvement (there was nothing further, surgically, that could be done to improve his condition) and referred Cross to a pain management specialist, Dr. Lee.

Three, MetLife ordered an independent medical examination ("IME") of Cross by Dr. Peach. Dr. Peach examined Cross, and reviewed his medical records and the video surveillance. He stated that Cross was uncooperative during the examination and therefore he was unable to validly estimate Cross's functional capacity. To that end, Dr. Peach recommended that Cross undergo a Functional Capacity Evaluation ("FCE") "to determine more objectively any valid functional limitations." Dr. Peach did, however, indicate that Cross was magnifying his symptoms, and he noted that the surveillance footage was "totally inconsistent with limitations claimed by the patient."

Four, Dr. Greenhood, another independent physician, reviewed Cross's medical records and spoke with Cross's treating physician, Dr. Lee. Dr. Greenhood did not examine Cross. However, from the information reviewed, Dr.

Greenhood inferred that Cross's "functional capacity is not severely limited" and that he is "capable of at least light work."

Five, Dr. Gosline completed a psychiatric review of Cross. Dr. Gosline determined that Cross's prior psychiatric treatment was related to a single episode of hospitalization due to Cross's narcotic dependence and withdrawal, rather than any ongoing disabling psychiatric condition. He concluded that Cross is not limited in his work capacity by any disabling psychiatric condition.

Six, Dr. Ito, an independent rehabilitation specialist, reviewed Cross's medical records and the surveillance footage. Dr. Ito opined that Cross could tolerate sedentary to light activity, provided that certain accommodations were in place. Dr. Ito also stated that, despite Cross's history of depression, dysthymia, anxiety, and pain, Cross is able to participate in activities he is motivated to pursue, as evidenced by his ability to coach a baseball team.

The following evidence, on the other hand, supports Cross's claim that he is "disabled" under the Plan.

One, Cross has an extensive record of medical treatment, back disorders, and pain. He underwent two lumbar surgeries, and a titanium implant was fused to his bone. After surgery, he received a number of epidural injections, and has been on an extensive regimen of pain, anti-anxiety, and anti-depression medication for

several years, including Elavil, Methadone, MS-Contin, Avinza, Effexor, Mellaril, Vicodin, Zoloft, Soma, and Gabitril. A post-surgery, cervical spine x-ray and MRI of Cross revealed a bulging disc and spondylosis (spinal deformity). Over the years, he has been diagnosed with intervertebral disc disorder, myelopathy (spine disorder) and radiculitis (pain radiating from spine). Since leaving his position at Georgia Pacific, he has seen numerous doctors and has consistently sought treatment for his well-documented history of pain.

Two, Cross's neurosurgeon, Dr. Javed, noted that Cross continued to experience pain after his surgeries. He recommended that Cross undergo an FCE to better determine his limitations. He stated his belief that Cross would be "unable to return to his present job" but that he may be able to return to "light-duty," depending on the results of the FCE.

Three, Cross's pain management specialist, Dr. Lee, diagnosed Cross with epidural fibrosis (the formation of scar tissue) and failed back syndrome, and stated that he has "ongoing nerve damage." Dr. Lee indicated that during an eight-hour day, Cross could only sit one hour, stand one hour, and walk one hour, could only occasionally lift eleven to twenty pounds, and could only carry up to ten pounds. He added that Cross should never climb or crawl and must lie down every two hours and elevate his legs. Dr. Lee noted that when Cross coaches his son's

7

baseball team he simultaneously increases his narcotic medication, indicating that, while he is physically able to perform the activity, it causes him an increase in pain. Dr. Lee opined that Cross "would benefit from continued psychiatric support, chronic pain management and spinal cord stimulator therapy." He concluded that Cross is currently disabled from "performing any gainful employment" and "will likely remain disabled for the remainder of his life."

Four, Cross was awarded social security disability benefits in March of 2003. While different standards apply to the ultimate award of benefits in the social security context, the ALJ determined that Cross suffered from "severe" impairments and "cannot perform on a sustained basis, even at the 'sedentary' level."

Five, Cross has a documented history of depression and anxiety, and has been prescribed anti-depressant and anti-anxiety medication. He was admitted to a hospital due to suicidal ideation, depression, narcotic detox, and history of back pain. Dr. Morgan, a psychiatrist, noted that Cross suffers from "major depression [combined with] depression secondary to long-term narcotic use and chronic illness with pain." Dr. Lee has also noted Cross's issues with depression and anxiety, finding that Cross's "depression scale is quite high" and that his depression is "exacerbating his pain." He referred Cross to a psychiatrist, Dr.

8

Yost.

The district court carefully considered all the evidence before it. It found that, while there was some evidence to question Cross's status as disabled, MetLife gave unreasonable weight to its experts' opinions in the face of Cross's contradictory evidence. Moreover, the court noted that while MetLife could have ordered an FCE to more adequately determine Cross's specific limitations, it did not. Lastly, the court found that MetLife failed to provide any evidence of exactly what job duties Cross could perform. Accordingly, the court concluded that MetLife's decision to terminate Cross's benefits was arbitrary and capricious, and granted summary judgment for Cross.

## II. STANDARD OF REVIEW

We review a district court's grant of summary judgment in an ERISA action de novo, applying the same legal standards that governed the district court's decision. *Green v. Holland*, 480 F.3d 1216, 1222 (11th Cir. 2007). One of three standards governs our review of a plan administrator's decision: (1) if the plan does not grant discretion to the administrator in deciding claims, we review the administrator's decision de novo; (2) if the plan grants the administrator discretion in deciding claims and the administrator does not suffer from a conflict of interest, arbitrary and capricious review applies; and (3) if the administrator has discretion,

but suffers from a conflict of interest, we review its decision under a heightened arbitrary and capricious standard. *See Gilley v. Monsanto Co.*, 490 F.3d 848, 856 (11th Cir. 2007); *HCA Health Servs. of Ga., Inc. v. Employers Health Ins. Co.*, 240 F.3d 982, 993 (11th Cir. 2001).[3] It is uncontested that MetLife has discretion in deciding claims under the Plan. It is also uncontested that MetLife does not suffer from a conflict of interest. Thus, as the district court found, and as both parties agree, we review MetLife's decision to terminate Cross's disability benefits under the arbitrary and capricious standard. Under that standard, we must determine whether there was a reasonable basis for MetLife's decision, based on the facts as known to MetLife at the time the decision was made. *Glazer v. Reliance Standard Life Ins. Co.*, 524 F.3d 1241, 1246 (11th Cir. 2008); *Jett v. Blue Cross & Blue Shield of Ala.,* 890 F.2d 1137, 1139 (11th Cir. 1989).

## III. DISCUSSION

MetLife's decision to terminate Cross's disability benefits was not supported by reasonable grounds. The surveillance footage recorded by MetLife's Special Investigation Unit provided a mere snapshot of Cross's activities throughout the

---

[3]Recently, in *Metropolitan Life Ins. Co. v. Glenn*, 128 S.Ct. 2343 (2008), in which a participant filed suit under ERISA to contest a plan administrator's termination of long-term disability benefits, the Supreme Court cautioned against the use of special rules based upon a conflict of interest: "Neither do we believe it necessary or desirable for courts to create special burden-of-proof rules, or other special procedural or evidentiary rules, focused narrowly upon the evaluator/payor conflict." *Id.* at 2351. This issue, however, is not before us. Therefore, we decline to say more.

day.  The surveillance spanned five days, but only resulted in approximately two hours of video.  While the footage does not show that Cross's physical abilities were limited, it also does not show Cross exerting himself.  At most, Cross is seen occasionally bending at the waist, squatting, and carrying equipment of an unknown weight.  What MetLife characterizes as Cross "pitch[ing] baseballs to a player in the batting net" is nothing more than Cross sitting on a bucket next to a batter and tossing baseballs a few feet up in the air for the batter to hit.  MetLife remarked that the video did not show Cross using "braces, supports or other orthopedic devices."  It also noted that the video shows Cross moving in a "smooth, fluid manner, without exhibiting . . . external signs of impairment or physical restriction."   While this may be an accurate characterization, these snapshots do nothing to disprove Cross's reports of pain.  In fact, Dr. Lee noted that Cross simultaneously stepped-up his dosages of pain medication during his coaching activities, indicating that these activities caused him an increase in pain.

Likewise, MetLife's independent physician reports do not provide a reasonable basis for MetLife's decision.  Of the four physicians relied on by MetLife, Cross was only physically examined by Dr. Peach.  However, due to what Dr. Peach felt ws a "lack of cooperation," he concluded that he was unable to validly estimate Cross's functional capacity ("I do not feel, based on the findings

11

of my physical exam, that I can make a valid estimation of [Cross's] functional capacity."). Dr. Peach recommended that Cross undergo an FCE, and opined that Cross's limitations "cannot be validated without" one.

Dr. Greenhood provided a brief physician consultant report. He did not examine Cross; instead it seems he based his opinion primarily on Dr. Peach's IME and a conversation with Dr. Lee. Dr. Greenhood noted that Dr. Lee does not believe Cross is capable of working. He inferred, however, from the surveillance, from Dr. Peach's IME, and from Dr. Lee's statement that Cross may have symptom amplification or somatization, that Cross is "functionally capable of at least light work." Dr. Greenhood did not expound on his analysis or on what, specifically, he considered to be "light work."

Nor did Dr. Gosline examine Cross, although it does seem that he carefully reviewed Cross's medical records. Nevertheless, Dr. Gosline, a psychiatrist, had no opinion on whether Cross was limited by a physical disability. Instead, he concluded that he could not find "adequate compelling information of a disabling psychiatric condition that would provide a global impairment of function that would prevent [Cross] from performing the duties of some occupation consistent with his physical limitations and with appropriate job modifications."

Lastly, MetLife relies on a report by Dr. Ito, an independent rehabilitation

12

specialist who reviewed Cross's medical record and the surveillance footage. After an extensive summary of Cross's medical history, Dr. Ito opined that Cross could "tolerate sedentary to light activity" provided that the following accommodations were in place: (1) restrictions on frequent overhead work, push-pull work, crouching, twisting and bending; and (2) position changes on an hourly basis, including "postural adjustments during any static positioning such as sitting or standing." Dr. Ito also stated that, despite Cross's history of depression, dysthymia, anxiety, and pain, Cross is able to participate in activities he is motivated to pursue, such as: planning and "participat[ing] in scheduled activities," and "relat[ing] interpersonally with children as well as adults."

Based on the surveillance and the above reports, MetLife concluded that Cross was capable of performing his prior occupation, and therefore, Cross no longer met the Plan's post-twenty-four-month definition of "disabled." To determine the physical requirements of Cross's prior occupation at Georgia Pacific as Shift Supervisor, MetLife performed an occupational analysis. The analysis determined that Cross's position most closely matches the DOT's position of Process-Area Supervisor.[4] Under the DOT, the position of Process-Area

---

[4] The ALJ, on the other hand, evaluated Cross's prior position in reference to the DOT's position of "Supervisor I, chemical plant" or "Chemical Operator II," both requiring "medium exertion."

13

Supervisor is one of "light-strength demand," and its physical demands include: (1) lifting, carrying, pushing, and pulling twenty pounds occasionally, ten pounds frequently, and a negligible amount constantly; (2) frequent reaching, handling, fingering, talking, hearing, and near visual acuity; and (3) occasional climbing, stooping, and crouching.

MetLife concluded that Cross is able to engage in the above activities even though none of its independent physicians specified the types of activities Cross is capable of performing. Dr. Peach and Dr. Javed each recommended that MetLife order an FCE in order to assess Cross's specific limitations. Dr. Peach explicitly stated that Cross's limitations could not be verified without an FCE. MetLife never ordered one.

Instead, MetLife unreasonably inferred Cross's abilities from the evidence before it. MetLife relied on the surveillance tapes, which were mere snapshots of Cross's activities over the course of several days. It did not address Dr. Lee and Dr. Ito's reports that these activities caused Cross an increase in pain. MetLife relied on an IME by Dr. Peach, the only one of MetLife's physicians who actually examined Cross. Dr. Peach concluded, however, that he could not validly assess Cross's actual limitations. MetLife relied on Dr. Gosline's report, which spoke only to Cross's psychiatric condition and did not address Cross's physical

14

limitations. It relied on Dr. Greenhood's rather conclusory report, which stated Cross was capable of "light work" but which did not address Cross's specific abilities and limitations. Finally, MetLife relied on Dr. Ito's report, which concluded that Cross could "tolerate sedentary to light activity" conditioned on a number of accommodations. MetLife, however, made no determination of whether these accommodations could be integrated into Cross's prior position.

At the same time, MetLife arbitrarily discounted the ample evidence supporting Cross's disability: the reports of Cross's treating physicians; Cross's clear record of pain; his adverse diagnoses, surgery, epidural injections, and extensive medication regimen; and the ALJ's finding that Cross suffered from "severe" impairments and "cannot perform on a sustained basis, even at the 'sedentary' level."

## IV. CONCLUSION

In light of the above findings, MetLife's determination that Cross is capable of performing his prior occupation is not supported by a reasonable grounds. Accordingly, we find MetLife's decision to terminate Cross's benefits to be arbitrary and capricious, and affirm the district court's grant of summary judgment.[5]

---

[5] It appears that the district court also granted Cross's motion for attorneys' fees, but it did not set forth its reasoning for doing so. In an order dated August 15, 2007, the court states

15

AFFIRMED, IN PART; VACATED, IN PART; AND REMANDED.



initially that "Plaintiff's motion for attorney's fees (Doc. No. 41) is GRANTED." However, at the conclusion of that order, it instead sets filing deadlines for Plaintiff's motion to *amend* its motion for attorneys' fees. Then, on May 8, 2008, the court granted Plaintiff's motion to amend its motion for attorneys' fees. This order is the final entry in the docket. We thus vacate the district court's August 15, 2007 order granting Cross's motion for attorneys' fees and remand for the district court to make specific findings.